UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH KINNEY, *on behalf of himself and all others similarly situated*,

                Plaintiff,

– against –

PUBLIC CONSULTING GROUP, INC. *and* STAFFING SOLUTIONS ORGANIZATION, LLC,

                Defendants.

**OPINION & ORDER**

22-cv-2458 (ER)

Ramos, D.J.:

      Joseph Kinney brought this suit against Public Consulting Group, Inc. ("PCG") and Staffing Solutions Organization, LLC ("SSO") (collectively, "Defendants") following the termination of his employment. He alleges that he and other similarly situated employees were given neither the 60 days of notice required under the federal Worker Adjustment and Retraining Notification Act ("WARN Act"),[1] nor the 90 days of notice required under the New York Worker Adjustment and Retraining Notification Act ("NY WARN Act").[2] Defendants initially filed a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). Doc. 14. However, on November 29, 2022, the Court informed the parties that it would construe Defendants' motion to dismiss as a motion for summary judgment and allowed the parties to submit additional papers. Doc. 30; Fed. R. Civ. P. 12(d). For the reasons set forth below, the motion is GRANTED.

---

[1] 29 U.S.C. § 2101 *et seq.*

[2] N.Y. Lab. Law § 860 *et seq.*

I. **BACKGROUND**

    A. **Factual Background**

On October 27, 2021,[3] during the COVID-19 pandemic, Joseph Kinney was hired by Defendants[4] to work as a contact tracer in their Virtual Call Center. Doc. 1 ¶ 15. The Virtual Call Center was managed by Defendants pursuant to a contract with the New York State Department of Health ("NYS DOH"),[5] as a part of the state's Contact Tracing Initiative ("the Initiative"). The Initiative sought to stop the spread of COVID-19. *Id.* ¶¶ 14–15.

In his role as a contact tracer, Kinney called New Yorkers whose positive COVID-19 test results were reported to the NYS DOH. Doc. 1 ¶ 21. He asked about their activities before and after the positive test. *Id.* Based on their responses, he assessed who else may be infected, and he contacted those individuals. *Id.* He then advised exposed individuals by providing general guidance and referring them to social, medical, and financial services. *Id.*

In early January 2022, the Defendants moved Kinney into a case investigator role, which focused primarily on advising individuals rather than assessing and calling others who may also be infected. Kinney's Response Opposition ("Kinney Resp. Opp'n"), Doc. 31 at 7. Around mid-January 2022, Defendants moved Kinney into a surge case investigator role, which did not involve assessing who else may be infected. *Id.*

Defendants—PCG and their wholly-owned subsidiary SSO, Doc. 1 ¶ 11—employed approximately 4,000 contact tracers. *Id.* ¶ 22. They "manag[ed] the day-to-day operations and work performed." *Id.* ¶ 18. They "provided scripts, established protocols, procedures, and

---

[3] Kinney's employment start date is not stated in Kinney's Complaint, Doc. 1. Rather, it is asserted in Defendants' Memorandum of Law in Support of Motion to Dismiss, Doc. 15 at 6, and is later restated in Kinney's Opposition to the Motion for Summary Judgment, Doc. 31 at 5.

[4] Kinney does not specify whether he was hired by SSO or PCG. Doc. 1 ¶ 6 ("Plaintiff was employed by Defendants . . . .").

[5] Defendants further clarify that "SSO's provision of staffing for the Initiative was pursuant to a contract with Health Research, Inc. ("HRI"), who in turn was contracted directly with NYS DOH, and PCG." Defendants' Reply ("Defs.' Reply"), Doc. 35 at 6–7; *see also* Doc. 39-1 at 6 ("The CONSULTANT will provide human resources, technical, and (as directed by HRI and the NYS DOH) call center management needed to support remote-based contact tracing . . . .").

workflows [], and kept track of [contact tracers'] work hours, compliance with policies, and performance." *Id.* ¶ 19.

The parties' dispute pertains to the beginning and end of Kinney's employment.  First, the parties dispute Kinney's understanding regarding the nature of his employment at the time of his hire.  Defendants allege that they "undisputedly made it clear to [Kinney] at his time of hire that his employment was temporary and would end based on the duration of the Initiative." Defendants Supplemental Brief ("Defs.' Suppl. Br."), Doc. 25 at 5.  They reference Kinney's offer letter, which stated the following:

> I am pleased to offer you a *temporary* position at Staffing Solutions Organization LLC ("SSO"), a Public Consulting Group, Inc. company, for the NYS Contact Tracing Initiative.
> [. . .]
> You will be *temporarily* employed as a Contact Tracer.  As such, you will be responsible for executing all duties assigned to you to the best of your ability in accordance with the NYS project.
> [. . .]
> The expected duration of this assignment is until December 2021, but that may change according to the *needs of the project* and does not otherwise affect your 'at will' status.
> [. . .]
> Your continued employment at SSO will be based on our evaluation of your performance and *project needs*.

Offer Letter, Doc. 27-1 at 2 (emphasis added).  In addition, Kinney's employment handbook indicated that "[w]hen the project concludes, . . . employees hired for the purpose of the project will be terminated." Kinney Resp. Opp'n at 6.

While Kinney admits that he understood that his employment was limited to the duration of the Initiative at the time of his hire, he denies that was clearly communicated by Defendants. *Id.* at 11.  More broadly, he disputes that the Initiative was itself actually temporary, given the lack of evidence of its discreteness, *id.* at 10, the "decade-long" relationship of Defendants and the NYS DOH, *id.*, and the open-ended, ongoing nature of the pandemic itself, *id.* at 14.

3

Relatedly, the parties also dispute the circumstances surrounding the end of Kinney's employment. On February 11, 2022, Defendants alerted the contact tracers that an unspecified number of employees would be terminated two weeks later. Doc. 1 ¶ 25; Termination Alert I, Doc 28-1 at 2. The identities of those that were going to be terminated were not disclosed. Doc. 1 ¶ 25. On February 24, 2022, about half of the contact tracers were told that they would be terminated. *Id.* ¶ 26. The next day, hundreds of employees, including Kinney, were in fact terminated. *Id.* ¶ 27. On March 11, 2022, Defendants again alerted the contact tracers that an unspecified number of employees would be terminated two weeks later. *Id.* ¶ 29; Termination Alert II, Doc 28-2 at 2. On March 24, 2022, hundreds of contact tracers were told that they would be terminated. Doc. 1 ¶ 30. And on March 25, 2022, the next day, hundreds of employees were in fact terminated. *Id.* ¶ 31.

Defendants allege these terminations were made pursuant to the completion of the Initiative. Defs.' Suppl. Br. at 6. They cite to Termination Alert I, which indicated that the impending "reduction in the [Virtual Call Center] workforce" was "[a]s a result" of the "transition[] from universal contact tracing to case investigations" and a "decline in cases." Termination Alert I at 2. They also cite to Termination Alert II, which indicated that due to "continuing decline in cases … the NYS DOH is taking steps to conclude the statewide universal contact tracing program" and that "[a]s we work towards the goal of concluding the statewide program, there will be another staff scale down." Termination Alert II at 2.

Kinney disputes that the Initiative actually ended. He alleges that even after the February termination alert, the Initiative continued. Kinney Resp. Opp'n at 8. In fact, he alleges it continues "to this day." *Id.* at 10. Kinney supports this allegation by describing the "open-ended nature of [the Initiative] work," *id.* at 4, which includes not only COVID-19 contact tracing and case investigation, but also community support services, *id.* at 6. He states that the Defendants "continue[d] supporting local health departments." *Id.* at 8 (internal citations omitted). And he argues that Defendants continue to employ and even hire others for work related to the Initiative. In support of this contention, Kinney attaches a Press Republican newspaper article reporting on

4

how local health departments "plan to proceed with COVID-19 contact tracing as the state's Virtual Call Center program ends." Doc. 33-1 at 2. He also attaches a current job posting for employment with Defendants, *see* Doc. 33-2.

Defendants state that the Initiative did in fact end. They cite to Termination Alerts I and II. They also demonstrate that the Press Republican newspaper article Kinney attaches details "how local health departments plan to proceed" *given* "the state's Virtual Call Center program ended this week." *See* Defs.' Reply at 7–8 (citing Doc. 33-1 at 2 (dated April 29, 2022)). They also include declarations from both an SSO official and a NYS DOH official attesting to the fact that the Initiative has ended. *See* Allen Affidavit ("Allen Aff."), Doc. 38 at 2 ¶ 7 ("The Initiative ended on April 30, 2022."); Backerson Affidavit ("Backerson Aff."), Doc. 37 at 2 ¶ 5 (same). Further, they point to public announcements of the completion of the Initiative, such as a January press conference where New York Governor Kathy Hochul stated that contact tracing was ending. Defs.' Reply at 12 n.9. Taken together, Defendants assert that the record indisputably shows that the Initiative ended. *Id.* at 11–12.

### B. Procedural History

Kinney filed the instant action on March 25, 2022. Doc. 1. He brought claims under the federal and NY WARN Acts, alleging therein that Defendants did not give him and the other contact tracers sufficient notice of the impending terminations as required by those statutes.

Defendants moved to dismiss the complaint on July 27, 2022, for failure to state a claim. Doc. 14. They argued that Kinney did not adequately allege that he was employed at a "single site of employment" as required by the federal and NY WARN Acts, as Kinney and the other contact tracers worked from home. Doc. 15 at 8. They also argued that Kinney did not demonstrate that PCG was his employer. *Id.* at 12. Defendants did not, in their initial motion to dismiss, argue that the federal and NY WARN Acts did not apply to Kinney because he was a temporary employee.

The Court ordered the parties to submit supplemental briefing as to the federal WARN Act's temporary employment exemption on November 9, 2022. Doc. 23. Both parties timely

5

submitted their supplemental briefs on November 22, 2022.  *See* Kinney Supplemental Brief ("Kinney Suppl. Br."), Doc. 24; *see also* Defs.' Suppl. Br.  Defendants attached various exhibits, including Kinney's offer letter and the employment termination alerts sent to Kinney and the other contact tracers.

After receiving those submissions, the Court informed the parties that it would construe Defendants motion to dismiss as a motion for summary judgment on November 29, 2022. Conversion Order, Doc. 30 (citing Fed. R. Civ. P. 12(d)).  At that juncture, the Court permitted Kinney to respond to Defendants' arguments and attached exhibits.  Conversion Order at 2.

Kinney timely submitted a response, *see* Kinney Resp. Opp'n.  The Court subsequently allowed the Defendants to reply.  Doc. 34; *see also* Docs. 35–39.

## II.    LEGAL STANDARD

Pursuant to the Conversion Order, the Court considers the pending motion for summary judgment.  Conversion Order (citing Fed. R. Civ. P. 12(d)).

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)) (internal quotation marks omitted).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

### III.  DISCUSSION

Kinney alleges that he and other similarly situated employees were given neither the 60 days of notice required under the federal WARN Act, nor the 90 days of notice required under the NY WARN Act.

Both federal and NY WARN Act liability is triggered if there are a sufficient number of employment losses due to a "plant closing" or "mass layoff" at a "single site of employment." *See* 29 U.S.C. § 2102(a); N.Y. Lab. Law § 860-b.  The statutes require employers to give 60 and 90 days of notice, respectively, to "each representative of affected employees as of the time of the notice or, if there is no such representative, to each affected employee; to the State or entity designated by the State to carry out rapid response activities; and to the chief elected official of the local governmental unit" within which the "plant closing" or "mass layoff" will occur.  *See* 29 U.S.C. § 2102(a); N.Y. Lab. Law § 860-b.  If an employer fails to do so, those terminated employees may seek damages equal to the amount of pay and benefits lost.  *See* 29 U.S.C. § 2104(a); N.Y. Lab. Law § 860-g.

The federal WARN Act defines a "plant closing" as a temporary or permanent closing of a "single site of employment" that affects 50 or more employees within a 30-day period.  29 U.S.C. § 2101(a)(2).  It also defines a "mass layoff" as a reduction in workforce that affects "(i) at least 33 percent of the employees and a minimum of 50 employees or (ii) at least 500 employees, over a 30-day period at a 'single site of employment.'"  29 U.S.C. § 2101(a)(3)(B).

The federal WARN Act applies to employers with "(i) 100 or more employees, excluding part-time employees; or (ii) 100 or more employees, including part-time employees, who in the aggregate work at least 4,000 hours per week, exclusive of hours of overtime." 29 U.S.C. § 2101(a)(1).

The NY WARN Act has a lower triggering threshold for its protections: it includes employers with less than 100 full time employees and "plant closing" when there are less than 50 individuals terminated. *See generally* N.Y. Lab. Law § 860-a. The NY WARN Act also provides for administrative enforcement in addition to private suits. *See* N.Y. Lab. Law § 860-g. Otherwise, all other definitions and requirements mirror those of the federal WARN Act. "Given [the] stricter requirements, wherever there is liability under the federal WARN Act, there is necessarily liability under the NY WARN Act." *1199 SEIU United Healthcare Workers East v. S. Bronx Mental Health Council, Inc.*, 2013 WL 6003731, at *2 (S.D.N.Y. Nov. 13, 2013).

### A. The Temporary Employment Exemptions

The federal WARN Act contains an exemption for temporary employment. 29 U.S.C. § 2103(1) ("This Act [29 U.S.C. § 2101 *et seq.*] shall not apply to a plant closing or mass layoff if—(1) the closing is of a temporary facility or the closing or layoff is the result of the completion of a particular project or undertaking, and the affected employees were hired with the understanding that their employment was limited to the duration of the facility or the project or undertaking . . . ."); *see also* 20 C.F.R. § 639.5(c)(1). The federal temporary employment exemption provides, in relevant part, as follows:

> Employees must clearly understand at the time of hire that their employment is temporary. When such understandings exist will be determined by reference to employment contracts, collective bargaining agreements, or employment practices of an industry or locality, but the burden of proof will lie with the employer to show that the temporary nature of the project or facility was clearly communicated should questions arise regarding the temporary employment understandings.

20 C.F.R. § 639.5(c)(2). The NY WARN Act also contains an exemption for temporary employment, N.Y. Lab. Law § 860-c(1)(c), which is identical to the federal provision.

8

Accordingly, if Kinney was hired with the clear understanding that his employment was limited to the duration of the Initiative, and his termination was the result of the completion of the Initiative, the temporary exemption applies. In other words, there is no outstanding genuine dispute of material fact if Kinney clearly and correctly understood that his employment was temporary when he was hired.

### B. Kinney Understood His Employment was Temporary

Kinney does not dispute that he understood his employment was limited to the duration of the Initiative when he was hired. In fact, he affirmatively admits this. Kinney states that "[b]ased on his communications with Defendants at the time of his hire, he was led to believe that his employment would end when the Initiative concluded." Kinney Resp. Opp'n at 5.

Curiously, however, Kinney claims that he came to this understanding in spite of Defendants' vague and contradictory communications. Specifically, he argues that "his onboarding paperwork made differing representations about the anticipated length of his employment." *Id.* at 14–15. He points to the statements in the offer letter that "[t]he expected duration of this assignment . . . may change according to the needs of the project" and that "continued employment at SSO will be based on our evaluation of your performance and project needs." Offer Letter at 2. These statements, he argues, differ from the employment handbook's directive that "[w]hen the project concludes, . . . employees hired for the purpose of the project will be terminated." Kinney Resp. Opp'n at 8. As these are "two different messages about the endpoint of [his] employment," Kinney argues that by "mixing their messages at the outset of employment, Defendants failed to 'clearly communicate' the endpoint for Initiative jobs." *Id.* at 15.

The record contradicts Kinney's contentions. First, as noted above, Kinney affirmatively admits to the relevant element of the statutory exemption: that he was "hired with the understanding that [his] employment was limited to the duration of the facility or the project or undertaking . . . ." 29 U.S.C. § 2103(1); *see* Kinney Resp. Opp'n at 5. Further, Kinney admits his understanding was not diminished by the differing language in the offer letter and

9

employment handbook as he "understood the . . . reference to 'project needs' [in the offer letter] in light of the [employment] handbook: that his employment would continue until the [NYS] DOH no longer 'needed' the Initiative and ended it." *Id.* at 6; *see* also Offer Letter at 2.

Moreover, the differing language used by Defendants, when viewed in context, does not obfuscate, but rather reiterates and even further specifies the fact that Kinney's employment was limited to the duration of the Initiative. Analyzed in connection with the statements in the offer letter—that Kinney was offered "a *temporary* position at SSO, a PSG company, for the NYC Contact Tracing Initiative"—the use of "project needs" in the offer letter does not suggest indefinite employment. Offer Letter at 2 (emphasis added).

Furthermore, as Defendants note, employers only carry the burden "to show that the temporary nature of the project or facility was clearly communicated." 20 C.F.R. § 639.5(c)(2). Employers are not required to state an exact end date. Interpreting the federal WARN Act, the Department of Labor ("DOL") has stated just that: "the duration and terminal point of many temporary projects may not be capable of being precisely defined at the beginning of the project due to the vargaries [sic] of other conditions and other factors." 54 Fed. Reg. 16042. As Defendants attest, that was the case here. Defs.' Reply at 14 (noting "difficulty forecasting an end date"). Nevertheless, the record demonstrates that it was clearly communicated to Kinney that his employment was limited to the duration of the Initiative.

### C. Kinney Understood the Initiative was Temporary

Kinney more broadly disputes that the temporary nature of the Initiative was ever clearly communicated to him by defendants.[6]

First, he states that "there is no record evidence defining the Initiative as a discrete project." Kinney Resp. Opp'n at 10. He complains that though he "was given to understand that there was a contract for the Initiative, where the Initiative would be defined," he never saw it, so the discreteness of the Initiative was not clearly communicated by Defendants. *Id.* at 11.

---

[6] In part, the argument that the temporary nature of the Initiative was not clearly communicated to Kinney merges with his other argument below: that the Initiative never actually ended. That is, it was never communicated to him that the Initiative was temporary because it was never actually temporary. *See* Kinney Resp. Opp'n at 13–14, 18.

Next, Kinney argues that because the Initiative was "part of a long-term relationship," it does not fit under the federal WARN Act's temporary exemption. *Id.* at 12. Kinney likens his situation to the example of a "long-term relationship" provided in the DOL regulation, where an aircraft manufacturer "hires workers to produce a standard airplane . . . under a contract with the U.S. Air Force with the expectation that its contract will continue to be renewed." 20 C.F.R. § 639.5(c)(4). Here, Kinney argues, amidst the "decade-long relationship between PCG and the NYS DOH in which the agency contracted out public service work" and as the Initiative was extended "three times," expectations of renewal were reasonably generated. Kinney Resp. Opp'n at 10, 12.

Further, Kinney argues that the very "nature of the [Initiative] work did not come with any built-in completion point," *id.* at 10, as is naturally featured in temporary employment situations involved in "harvesting" or "processing" within agriculture and construction temporary employment contexts, *see* 20 C.F.R. § 639.5(c)(3). Rather, contact tracing could have continued indefinitely as, according to Kinney, there is "no quantifiable end to the COVID-19 pandemic and the public health response to it has shifted over time in ways that were certainly not forecast at the outset." Kinney Resp. Opp'n at 14.

Again, the record contradicts Kinney's contentions. The most relevant document from the record is Kinney's own offer letter. The offer letter explicitly described the employment as temporary twice. *See* Offer Letter at 2. It stated that his employment existed only in service of the Initiative. *See id.* (describing "a temporary position at SSO, a PCG company, for the NYS Contact Tracing Initiative," with all duties "in accordance with the NYS project"). And the letter also characterized the Initiative as temporary to the extent it projected an end date. *See id.* ("The expected duration of this assignment is until December 2021, but that may change according to the needs of the project.").

To be sure, "[g]iving written notice that a project is temporary will not convert permanent employment into temporary work, making jobs exempt from WARN." 20 C.F.R. § 639.5(c)(3). The federal and NY WARN Acts exist to provide notice to employees facing mass employment

11

terminations, *see* 29 U.S.C. § 2102(a); N.Y. Lab. Law § 860-b, and simply adding the word "temporary" does not *ipso facto* render employers immune from liability. However, that is not what Defendants did here. Not only is the temporary nature of the Initiative repeatedly and unequivocally stated in the offer letter, it is also confirmed in the employee handbook.[7] Furthermore, the contract between Defendants and the NYS DOH[8] clearly provides that Defendants' provision of staffing for the NYS DOH was limited to the Initiative, which was itself defined therein and therefore discrete. Contract and Amendments ("Contract and Ams."), Doc. 39-1–39-13.[9] While Defendants did not provide this documentation to Kinney when he was hired, this alone does not create a failure "to show that the temporary nature of the project or facility was clearly communicated," 20 C.F.R. § 639.5(c)(2), when it was clearly communicated in every other communication. *See* Offer Letter at 2.

When considering federal WARN Act claims, this Court must take a "practical view of the actual employment situation of workers." *Martin v. AMR Servs. Corp.*, 877 F. Supp. 108, 113 (E.D.N.Y. 1995). Here, where an offer letter repeatedly and unequivocally states the employment is temporary, pursuant only to an Initiative, amidst an evolving pandemic response, that does not create a reliance interest in indefinite employment of the sort that the federal and NY WARN Acts were legislated to provide notice for in the event of mass termination. In fact, opposite Kinney's argument, the ever-evolving nature of the pandemic and the NYS DOH's response would engender less certainty for employees about indefinite employment. As the DOL emphasizes, "in uncertain situations, it may be prudent for employers to clarify temporary

---

[7] It is of no event that Kinney was subsequently moved into a case investigator role and then a surge case investigator role. Kinney Resp. Opp'n. at 7. Kinney does not allege that those roles were governed by different contracts, and all were nevertheless pursuant to the Initiative.

[8] Defendants state that "[i]n light of the allegations in Plaintiff's Complaint, Defendants had no reason to attempt to 'prove' that the Initiative was a discrete project that was contractual in nature." Defs.' Reply at 6. Thus, as their supplemental briefing was intended to comport with the evidentiary requirements of a F.R.C.P. 12(b)(6) motion to dismiss," *id.* at 7 n.4, they did not include the contract at the outset. It is now before the Court.

[9] Defendants attach all of the amendments to the contract "in the event the Court will find a review of the amendments to be useful," although "Defendants do not believe that all of the amendments to the [contract] are relevant to the Court's analysis of the arguments at issue in the instant motion." Defs.' Reply at 7 n.2.

work understandings in writing when workers are hired." 20 C.F.R. § 639.5(c)(3).  Defendants did so here.  The DOL further enclosed sample language for that written clarification.  It reads as follows:

> Workers on this project are being hired on a project-only basis. When this contract is completed, your job will be terminated. At that time, you may or may not be offered another job on a different project as needs dictate.

54 Fed. Reg. 16042-01(c).  The Court finds that the language used by Defendants in Kinney's offer letter meets this standard, and is even more specific.  It states that the employment is temporary multiple times, and states that employment is only pursuant to the Initiative's "project needs."  *See* Offer Letter at 2 ("We are pleased to offer [Kinney] a *temporary* position at SSO, a PCG company, for the NYS Contact Tracing Initiative" and "[Kinney] will be *temporarily* employed as a Contact Tracer.").  Thus, Defendants did clearly communicate the temporary nature of Kinney's employment at the time of hire.

That the Defendants entered into additional contracts with the NYS DOH does not create an expectation of indefinite employment.  The continued relationship between Defendants and the NYS DOH is a far cry from the aircraft manufacturer example in 20 C.F.R. § 639.5(c)(4).  There, an aircraft manufacturer had an "expectation that the contract would continue to be renewed during the foreseeable future." 20 C.F.R. § 639.5(c)(4).  In contrast, here Defendants and the NYS DOH's Initiative-specific contract ended—indeed the offer letter provided an expected end date—and they entered into subsequent, different contracts.  The record demonstrates that the subsequent contracts between Defendants and the NYS DOH differ in purpose, partner(s), and scale.  *See* Docs. 39-1–39-13.  While some include "varied and targeted COVID-related services, [this is] at the direction and under the supervision of individual local health departments[s]" and is thus "distinct from the strictly contact tracing and case investigation support that SSO provided through the Virtual Call Center at the direction of the NYS DOH" pursuant to the Initiative-specific contract.  Defs.' Reply at 10–11.

The many exhibits that Kinney attaches speak to the difference between these subsequent efforts and the Initiative. For example, the Press Republican newspaper article reported on local health departments' plans for "how they plan to proceed with COVID-19 contact tracing as the state's Virtual Call Center program ends." Doc. 33-1 at 2. In addition, the job posting Kinney attaches advertises a position which "report[s] to the Deputy Regional Team Manager for your area and work[s] closely with the Local Health Department and the NYS Department to rapidly address cases within schools." Doc. 33-2 at 3. The position focuses entirely on grades K-12 COVID-19 case management. *Id.* at 4. The posting seeks applicants with "[e]xperience working in a [sic] educational setting or with schools or school-age children." *Id.* This is not the same as Kinney's role as a contact tracer, case investigator, or surge case investigator. Conceivably for this reason, Tina Allen, an SSO official, stated that "[a]ny SSO employees that had worked on the Initiative that were interested in working on this *new* local health department service project were requested to apply for *new* positions . . . ." Allen Aff. at 2 ¶ 10 (emphasis added).

Lastly, that the Defendants extended the Initiative-specific contract several times does not create an expectation of indefinite employment. Only one extension occurred during Kinney's own employment. Kinney was ultimately employed until February 25, 2022, only two months beyond the predicted end date of December 2021 contained in his offer letter. *See* Doc. 1 ¶ 27; *see also* Offer Letter at 2. Ultimately, when analyzed in connection with the explicit language in the offer letter, the brief extension granted to Kinney does not defeat Defendants' otherwise clear communication about the temporary nature of the Initiative.

### D.  Kinney's Termination Was the Result of Completion of the Initiative

Kinney argues that his termination was not "the result of the completion of a particular project or undertaking," 29 U.S.C. § 2103(1), as the federal WARN Act's temporary exemption requires, because the Initiative has not, to this day, ended. He also suggests that because the terminations were not executed on the final day of the Initiative, they were not the result of the completion of the Initiative.

Again, the Court finds that the record contradicts Kinney's contentions. First, it is evident that the Initiative has, in fact, ended. The contract between Defendants and the NYS DOH makes that clear.[10] Contract and Ams. Further, Defendants include declarations attesting to the actual completion of the Initiative by those involved in the Initiative contract itself: an SSO official and a NYS DOH official on the Initiative. *See* Allen Aff. at 2 ¶ 7 ("The Initiative ended on April 30, 2022."); Backerson Aff. at 2 ¶ 5 (same). Moreover, information about the end of the Initiative was public. The Press Republican newspaper article states that "the state's Virtual Call Center program ended this week." *See* Doc. 33-1 (dated April 29, 2022). And there were public announcements that the Initiative was ending. As Defendants note, Governor Kathy Hochul announced in a press conference on January 11, 2022, that contact tracing (the raison d'être of the Initiative) would no longer be mandatory. Defs.' Reply at 12 n.9.

Critically, the evidence in the record also establishes that Kinney's termination was pursuant to the completion of the Initiative. Both parties agree that on February 11, 2022, Defendants alerted their contact tracers that an unspecified number of employees would be terminated two weeks later. Doc. 1 ¶ 25; Termination Alert I at 2. Termination Alert I stated that the "reduction in the [Virtual Call Center] workforce" was "[a]s a result" of the "transition[] from universal contact tracing to case investigations" and a "decline in cases." Termination Alert I at 2. This explanation, as well as the explanation contained in Termination Alert II—that due to "continuing decline in cases . . . the NYS DOH is taking steps to conclude the statewide universal contact tracing program"—matches Defendants' rationale for ending the Initiative.[11] Termination Alert II at 2.

Finally, it is also of no event that the terminations were not executed on the final day of the Initiative. As Defendants observe, that is not required anywhere in the federal or NY WARN

---

[10] Defendants note that "despite the Initiative's contract ending on June 30, 2022, work on the Initiative actually ended two months earlier, on April 30, 2022." Defs.' Reply at 11 n.8 (citing Backerson Aff. at 2 ¶ 5).

[11] To be sure, Kinney's termination was communicated and effectuated in February; Termination Alert II did not pertain to him. However, as it accomplishes the terminations in a manner "[s]imilar to the scale down performed last month" it is part of the record evidence that speaks to Defendants' purpose. Termination Alert II at 2.

Acts; terminations need only be the "result of the completion of a particular project or undertaking." Defs.' Reply at 15 (citing 29 U.S.C. § 2103(1); N.Y. Lab. Law § 860-c(1)(c)). As Kinney's termination was clearly pursuant to the completion of the Initiative, there is no outstanding genuine dispute of material fact. Kinney's characterization of his termination as the result of "80% or 90%" completion of the Initiative, Kinney Resp. Opp'n at 18, has no basis in the statutory language of the federal or NY WARN Acts, or the practical realities of such events of mass termination.

## IV.    CONCLUSION

For the foregoing reasons, the Defendants' motion is GRANTED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 14, and close the case.

It is SO ORDERED.

Dated:   March 21, 2023
         New York, New York

_____
Edgardo Ramos, U.S.D.J.